UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

    vs.                                        CRIMINAL NO. 3:18CR131 (SRU)

MIRIAM DUBAY                                  October 9, 2018

## **DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The defendant, Miriam Dubay, submits this memorandum in aid of sentencing, which is scheduled for Wednesday, October 17. For the reasons that follow, Ms. Dubay submits that in light her history and demonstrated personal growth, as well as the circumstances of this offense, the Court should impose a non-custodial sentence that includes a substantial period of home confinement.

## **FACTUAL BACKGROUND**

"I have no excuse for my behavior. I allowed my maternal protective instincts override all that I know to be right. … I am sorrier than you will ever know." *See* PSR at ¶ 15. Miriam Dubay wrote these words to her employers on April 3, 2017, approximately four months after resigning and nearly 11 months before she was contacted by law enforcement.[1] Her regret ran deep, and it has only intensified over time, not only because she exercised terrible judgment and broke the law, but also because she hurt her employers, who were good people and who were good to her. Prior to this case, Ms. Dubay had never been in trouble before, had enjoyed a long professional career as an accountant, and had been raised to know what was right. Yet, when she was struggling with a depressed husband, a troubled daughter, and her own alcoholism, she lost her way.

---

[1] Ms. Dubay's first contact from law enforcement was through a target letter dated February 28, 2018.

*Personal History*

Her upbringing belies her conduct in this case. Born in Iowa in 1952, Ms. Dubay grew up in a large family with five siblings and two loving parents. She characterized her childhood as "footloose and fancy free," and described her neighborhood as a nice place to grow up. She was very close to her parents, describing her mother as "the best," and was close to her brothers and sister.

Ms. Dubay graduated from School of the Holy Child in 1970, and enrolled at Emmanuel College in Boston. During her sophomore year in college, she heard that Emmanuel was possibly closing down, which prompted her to take a year off to apply for other schools. She spent a significant portion of that year living with her mother while her father traveled to work during the week. In September 1973, Ms. Dubay moved to East Lansing, Michigan to start school at Michigan State University. One month later, in October 1973, Ms. Dubay's mother passed away suddenly from a cerebral hemorrhage. The loss shook the family, particularly Miriam.

Soon thereafter, Ms. Dubay met her first husband and as a result, remained in Michigan until 1986. During this time, however, life grew darker for Ms. Dubay. Her husband was emotionally and physically abusive toward her, and it grew progressively worse. Ms. Dubay often arrived at work with visible bruises, and she was aware that the abuse was often fueled by alcohol. She would periodically leave with their daughter, Sarah, and return to Connecticut, but she was often convinced to return to Michigan with promises that things would improve. One night in 1985, her husband became excessively violent and she spent a week in a battered women's shelter. She subsequently fled to Connecticut with her daughter so she could safely divorce him.

These years were tremendously difficult for Miriam. As her cousin, Kathryn Preziosi, wrote in her letter to the Court, "I believe Miriam married her first husband searching for someone to lean on and what she got was an abuser. Her decision making became a challenge and she had no one to

2

turn to." Exhibit E, Letter of Kathryn Preziosi. Her oldest brother, Ray Peterson, recalls that once he was made aware of the abuse, he "had [Miriam] go to a shelter and shortly file for divorce and move to Connecticut." **Exhibit B, Letter from Ray Peterson**. As her brother Eric noted in his letter, her life had become a "far cry from the laughter she knew growing up." **Exhibit C, Letter from Eric Peterson**.

Miriam returned to Connecticut in 1986, and met another man in September 1987. They had a child together, Jennifer. Miriam had always been deeply involved in her children's lives, leading girl scouts, volunteering for cheerleading events, and participating in social activities. Her former employer, Philip Novak, and his wife, JoAnn, were able to observe her personal life over the 17 years that she worked for Mr. Novak at the Stamford Museum and Nature Center:

> We were able to observe her personal life and we often spoke of the challenges of raising a family. Her daughters and grandson are the loves of her life. As a mother, she would do anything for them. We saw how she volunteered her time during their childhood in various activities. She was involved in Girl Scouts as a Brownie leader, Cookie mom and treasurer. Miriam volunteered at the Walter Schalk School of Dance as a costume maker and dressing room supervisor. Miriam was also a team Mom and Assistant Coach for the Southern CT Pop Warner Cheerleading activity. As volunteers ourselves, we know how difficult it is to find help for children's activities. Not for Miriam. She was always front and center.

**Ex. D, Letter from Philip and JoAnn Novak**. She wanted to provide her daughters a good life, and engaged in these activities as a way of supporting them. As a mother, she gave as a way to ensure their happiness. As her daughter grew older, however, those needs became more difficult to fulfill, particularly as the family's life at home grew more complicated. Ms. Dubay's cousin noted that she "loves her daughters very much and so yearned for their attention." **Exhibit E, Letter from Kathryn Preziosi**. That need to satisfy her daughter's needs helps to explain why she finds herself before this Court. Her brother-in-law perhaps best characterized her relationship with her daughters by noting

3

that Miriam was "remained dedicated to children to an almost frantic degree." Exhibit G, Letter of Jessup Thompson.

A few years into the marriage, Ms. Dubay's husband checked himself into a hospital for an alcohol rehabilitation program. He later returned to rehab in 1996 for a short stay. When he returned, he was changed and his depression filled the home. As Ms. Dubay writes in her letter to the Court, "[b]y the end of our marriage he would barely acknowledge my existence." **Exhibit A, Letter from Miriam Dubay.** Ms. Dubay, too, grew depressed, and was drinking to excess. As evidenced by the letters from her friends and former employer, her drinking exacerbated her depression.

Her older daughter was spared much of this chaos as she left home and went to college in 2000. Jennifer, who was six years younger, was in the middle of her parents' misery. Ms. Dubay's husband was distant and unkind, and took out his frustrations on their daughter when Ms. Dubay was not around to bear the brunt of his angry depression. She watched as her daughter became increasingly anxious and suffer panic attacks, and as a mother, she wanted to take away that pain. As she writes to the Court, "[b]ecause of this situation and the effect it was having on Jen's psyche I felt the need to do whatever it took to get her to a safe place. I was sure I would lose her if I did nothing. I mistakenly thought that I could single-handedly right all the wrongs that surrounded me." **Exhibit A, Letter from Miriam Dubay**.

*Offense Conduct*

In 2010, when the offense conduct started, Jennifer was 22 years old, and Ms. Dubay wanted her to feel better. In Ms. Dubay's depressed and alcoholic state, she determined that she needed money to "fix" Jennifer. At this time, Ms. Dubay was working as a bookkeeper for California Closets, where she had been employed since March 2004. She started defrauding the company by writing checks on company stock made out to cash. The first year, the amounts did not exceed $700, but in

4

the years that followed, the amounts grew larger.  Although she used some of this money for her own needs, a significant amount went to her daughter.  The family's observations of this period are consistent with Ms. Dubay's account.  As Ms. Preziosi wrote, "[t]he youngest child had always been demanding and that [sic] she basically blackmailed her mother over the years in exchange for money only pretending to care about her." **Exhibit E, Letter from Kathryn Preziosi**.  Her brother, Ray, wrote that her daughter approached other family member for money once Ms. Dubay had nothing left to give, and that Jennifer has not been in contact with her mother since the charge was filed.  After years of devoting her time and energy to her daughters, she now finds herself estranged from both.

In December 2016, Ms. Dubay left California Closets to move to Virginia to be closer to her sister.  The fraud was discovered soon after she left when a new bookkeeper came on board and noticed the irregularities.  Approximately four months after leaving California Closets, but nearly 11 months prior to receiving a target letter, Ms. Dubay wrote to her former employers an apology letter, offering to make whatever reparations she could. PSR at ¶ 15. At that time in April 2017, she wrote, "I am sorrier than you will ever know." *Id.*  Her remorse and regret for her conduct has only festered, and every day she lives with the pain and betrayal she caused her employers.  As she writes to the Court, "[e]very day, I think about the pain that I caused Steve and Cathy Brennan.  Every day, I think about the pain and embarrassment I caused my family by my terrible judgment.  While there are reasons for what I did there are no excuses." **Exhibit A, Letter from Miriam Dubay.**

Ms. Dubay has taken full responsibility for her misconduct and most notably, has made strides toward rehabilitation since her contact from law enforcement.  She recognized that her mental health and alcoholism played a significant role in her terrible decision making, so she sought to remedy those issues.  She started therapy in April 2018, soon after she received a target letter, and is being treated for a major depressive disorder and anxiety.  Most importantly, Ms. Dubay

5

stopped drinking after years of alcohol abuse, a problem that only fueled her depression and poor judgment. As of the date of sentencing, she will be 93 days clean and sober. As her sister wrote, "I have witnessed the changes brought about by receiving therapy, being prescribed proper medication and last but by no means least, stopping drinking. I believe she is on week nine." **Exhibit F, Letter from Judith Thompson**. Ms. Dubay also started working again, but in a much less significant capacity. Despite her advanced degree in accounting, she humbled herself by accepting a full-time position at the deli counter at a Harris Teeter grocery store, where she earns minimum wage. She prides herself on her work ethic, and is grateful for the opportunity to be employed and to stay busy.

When Ms. Dubay was first contacted by law enforcement in February 2018, she only told her sister, Judith, about what she had done. Subsequent to that time, she has written to her family and close friends to explain what she did and how sorry she is, not only to her former employer, but also to her family and friends whom she disappointed. As evidenced by the thoughtful letters attached hereto, they have not just forgiven her, but embraced her. Ms. Dubay is fortunate to have the love and support of her family and old friends, people who were collectively shocked to hear that Miriam could have done anything criminal. As her brother, Ray, wrote,

> Miriam is so loved by all of her siblings. She is third of the six of us but is also the "big sister." When I was in Vietnam, it was she who held my mom together. When any of us had medical issues of a serious type, it was she who communicated with others and visited us in the hospitals. She, of all of us, was the one we could count on.
>
> So, when I received her letter of apology, sent to her immediate family and requiring great strength and humility, it stunned and shocked me to the core. In conversations with my siblings, they were equally shocked. This was so removed from the bright, sensitive, caring and smart (although not in this case) person we grew up with.

**Exhibit B, Letter from Raymond Peterson**. Her youngest brother, Eric, writes as follows:

6

> The decades long experiences scarred her terribly and led to her own depressive state characterized by excessive drinking. That persistent condition may have clouded her judgment so dramatically that it resulted in her current situation. I know she is repentant and will work to remedy the situation as best and in any way she can because she was always a woman of integrity and cannot bear the idea that her wonton and reckless actions have ruined that reputation. That's what shocked us all when the family got the news. It just couldn't be our Tushie.

**Exhibit C, Letter to Eric Peterson.**

> **A NON-CUSTODIAL SENTENCE IS REASONABLE AND APPROPRIATE THROUGH DOWNWARD DEPARTURES OR THROUGH A VARIANCE BASED ON THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a).**

United States Sentencing Guideline § 1B1.1 establishes a three step process for arriving at a reasonable sentence that includes (1) establishing the appropriate guideline range, (2) determining if there are any departures warranted based on the existence of extraordinary factors "of a kind" or "to a degree" that were not adequately considered by the guidelines, and (3) assessing whether a non-guidelines sentence of "variance" from the guidelines is warranted based on the factors set forth by 18 U.S.C. § 3553(a).

The parties agree that Ms. Dubay's base offense level under U.S.S.G. § 2B1.1(a)(1) is 7, and that her level is more than doubled to 19 as a result of the 12 point enhancement for the loss amount. The Government and the United States Probation Office take the position that a two-level enhancement is warranted under U.S.S.G. § 3B1.3 because Ms. Dubay abused a position of private trust. Although Ms. Dubay reserved the right to contest this upward departure in the plea agreement, she concedes that its application is appropriate under the circumstances of this case. Accordingly, a total offense level of 18 with a criminal history category I yields a guideline range of 27 to 33 months. There are a number of factors present in this case that "combine to create a situation that 'differs significantly from the heartland cases covered by the guidelines'." *United*

7

*States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996). Whether taken individually or in combination, the proposed departures below highlight why a non-custodial sentence is appropriate in this case.

### A. Ms. Dubay's Zero Criminal History Points Demonstrate her Likelihood of Recidivism is Extremely Low.

"Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism. *United States v. Germosen*, 473 F.Supp.2d 221, 227 (D. Mass. Jan. 18, 2007) (Gertner, J.). (citing United States Sentencing Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, 15 (Jan. 4, 2005).[2] The United States Sentencing Commission has conducted statistical analyses to assess the recidivism rates of defendants based on numerous criteria, including but not limited to criminal history points, over an extended period. The most recent iteration of the Commission's research was released in March of 2017. The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders (March 2017).[3] The Commission's findings point to the conclusion that Ms. Dubay is highly unlikely to recidivate. This empirical evidence, set forth below, suggests that the punishment prescribed by the guidelines based on a Criminal History category of I may consequently be overstated in this case and a sentence within that range may not be consistent with the statutory mandate that the sentence imposed be sufficient but not greater than necessary to meet the goals of a criminal sentence. See 18 U.S.C. § 3553(a). Specifically, Criminal

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.

[3] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

8

History category I, which accounts for those with both 0 and 1 criminal history points, covers individuals with statistically disparate levels of likely recidivism. Individuals with zero criminal history points subsequently are rearrested in 30.2% of cases, while those with one point are rearrested over 50% more often, at 46%. The re-arrest rate for those with no prior criminal justice contact is even lower, at 25.7%. Along other dimensions considered by the Commission, Ms. Dubay also poses a low risk of recidivism. The commission, for example, found that women recidivate at a rate far lower than men (36.4% vs 52.2%). Even without considering her personal character and circumstances, designation of Ms. Dubay simply as falling into Criminal History category I elides this important distinction between people, like her, with no previous criminal history, and those with modest criminal history. The sentence in this case should reflect that statistical reality, even though the Guidelines do not.

Her likelihood of recidivism is even lower on account of her age. As one Court noted in a comparable case involving a 65 year old defendant, "[i]t is highly unlikely that [the defendant] will repeat his criminal conduct given that he is sixty-five year[s] old and previously had no criminal history points." *United States v. Greene*, 249 F.Supp.2d 262, 267 (S.D.N.Y. 2003). In *Greene*, age was one of the factors that warranted a non-custodial sentence. *Id.*

### B. Ms. Dubay has Made Extraordinary Efforts at Rehabilitation

The Second Circuit has recognized that "the Guidelines did not adequately consider rehabilitation efforts undertaken at various times." *United States v. Core*, 125 F.3d 74, 76 (2d Cir. 1997). As a result, Courts have recognized departures for post-offense drug rehabilitation, *United States v. Maier*, 975 F.2d 944 (2d Cir. 1992); and for post-arrest non-drug rehabilitation, *United States v. Workman*, 80 F.3d 688 (2d Cir. 1996). These efforts may warrant a departure, as "awareness of one's circumstance and the demonstrated willingness to act to achieve rehabilitation,

9

thereby benefitting the individual and society, can remove a case from the heartland of typical cases, thus constituting a valid basis for departure." *Core*, 125 F.3d at 76 (citations omitted).

Ms. Dubay has devoted significant time to addressing the cause of her criminal conduct. She has engaged in individual behavioral counseling with her therapist, Karen Wells, since April 2018. She has engaged with a psychiatrist so she is properly medicated for her depressive disorder and anxiety. Most critically, she has stopped drinking alcohol. These were the components that led her to engage in criminal behavior, and she has taken pains to address each one. She has also remained engaged by working at a grocery store at a deli counter. In her adult life, Ms. Dubay was always been employed in a professional capacity, but she knew what mattered most was not what she did for work, but that she was earning money and supporting herself on whatever meager a salary she might command.

In addition, she has taken responsibility for her conduct. In March 2017, she was served with a civil action related to this case, and a lien was filed on her home. She did not hire a lawyer, or contest the matter. Instead, she wrote the April 3, 2017, expressing her deep regret. She has never been equivocal about her conduct in this case, and has always accepted responsibility. Her rehabilitation efforts are proof of this fact, since her time during the pendency of this case has been devoted to unearthing the root problems and addressing them. Jessup Thompson, her brother-in-law who lives close to Ms. Dubay in Virginia, wrote to the Court,

> Since the time that she separated from her husband and moved here she has changed quite dramatically, seeking the help of a therapist, she is no longer drinking, and she has worked and developed new ties to her new community. She has demonstrated great remorse about her prior actions, and though quite depressed and saddened she has soldiered on and accepted responsibility, and has been working hard to try to make right the wrongs she has committed.

**Exhibit G, Letter from Jessup Thompson**.

### C. The Sentencing Guidelines Do Not Provide A Sound Empirical Foundation For The Guideline Range At Issue In This Case.

In calculating Ms. Dubay's offense level, the loss table in U.S.S.G. § 2B1.1(a)(1) more than doubles the base offense level, moving it from 7 to 19. The Guidelines' reliance on loss tables for sentencing in financial offenses has been appropriately criticized by the Courts, and, in fact, has been cause for remand. In *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016), the Second Circuit remanded for resentencing a case in which application of the fraud loss table increased the defendant's base offense level from 6 to 16. In so doing, the Second Circuit instructed the district court on remand "to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *United States v. Algahaim,* 842 F.3d 796, 800 (2d Cir. 2016). Discussing its reasons for the remand, the Court explained:

> [T]he Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead the Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider. *See Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (sentencing judge may make a non-Guidelines sentence if the judge disagrees with a Commission's policy determination); *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) (in banc) (same). Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence. *Cf. United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003) (cumulative effect of overlapping enhancements warranted consideration of departure), *reh'g denied*, 362 F.3d 160 (2d Cir. 2004); *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) (same).

*Id*. By remanding the case for sentencing, and instructing the courts to consider whether to set aside

the loss table on policy grounds, the Second Circuit relied on the Supreme Court's decision in *Kimbrough*, in which the Supreme Court had explained that the crack cocaine guideline, which "did not take account of empirical data and national experience," was not entitled to deference. 552 U.S. at 109 (internal quotation marks omitted). This analysis reflects the reality that this Court, sitting by designation in the Second Circuit, observed in a 2013 concurring opinion: "the loss guideline, like the child pornography guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, D.J., concurring).

The problem with the loss table is not only that it lacks a solid empirical foundation. It also reflects a single-minded focus on the loss amount without accounting for the numerous pertinent factors that a sentencing court should consider. *See e.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (noting that by "making a Guideline sentence turn, for all practical purposes, on this single factor . . . [the] Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."). *See also, United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

The purpose of the loss table was to reflect the Sentencing Commission's belief that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many [white collar] crimes, particularly when compared with the status quo where probation, not prison,

12

is the norm." U.S.S.G., ch. 1, intro, pt. 4(d)(1987). Empirical research, however, has demonstrated no difference between the deterrent effects of probation versus prison. *See* David Weisburd et al., "Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes," 33 *Criminology* 587 (1995). As a 2012 review of the studies that have examined the deterrent effect of sentence severity concludes, "the vast majority of these comprehensive summaries found no convincing evidence suggesting that harsher sentences deter." Webster, Cheryl Marie, and Anthony N. Doob. "Searching for Sasquatch: Deterrence of crime through sentence severity." *The Oxford Handbook on Sentencing and Corrections* (2012): 173-195, at 176. Recognizing that "effective deterrence arises from certainty, not harshness, of punishment," a decision in the Eastern District of New York sensibly asks whether "our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques." *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (Weinstein, J.).

### D. The Factors Contemplated By 18 U.S.C. § 3553(a) Weigh In Favor Of a Non-Prison Sentence

#### i. *Ms. Dubay's Personal History, Character and Circumstances Support a Non-Prison Sentence*

The numerous letters of support demonstrate that Ms. Dubay is well-loved, well-respected, and that this conduct was a complete to shock to those who know and love her well. Her family knew of her difficult marriages and struggles with depression and alcoholism, but because she was a pillar in the family, no one could conceive that she would commit this crime. Her prior employer of 17 years was equally astonished, writing that during that time that Ms. Dubay worked for him as a bookkeeper at the Stamford Museum and Nature Center, she was "an outstanding employee" who was "honest, hard-working, thorough and displayed the highest degree of integrity. She never let

13

me down." **Exhibit D, Letter from Philip and JoAnn Novak**. She has been a source of strength and support to her family, evidenced by the letter from her brother, Eric, that described how "[w]hen tragedy struck and took our mother too early at age 46, Tushie was an enormous source of strength, care and love for us," returning home from college to check on her siblings. **Exhibit C, Letter from Eric Peterson**.

This conduct coincided with a deep place of alcohol fueled depression, and her efforts to fix a broken situation. She has made remarkable efforts to address the roots of those problems, and by all accounts is showing tremendous signs of change.

> ii. *A Non-Custodial Sentence Will Satisfy the Court's Need to Reflect the Seriousness of the Offense, to Provide Just Punishment, and to Afford Adequate Deterrence*

The conduct that brings Ms. Dubay before this Court is not reflective of who Ms. Dubay is as a person, but the terrible choices she makes when in the throes of untreated alcoholism and depression. The fact that Ms. Dubay worked 17 years as a bookkeeper in Stamford and six years at California Closets before commencing any criminal conduct reinforces this observation. Ms. Dubay had no malicious intent relative to her employer. They were good to her, and it was a good, steady job. Yet, the circumstances of her life clouded her judgment, and she betrayed the trust of those who entrusted her with the responsibility of managing their account.

Ms. Dubay did not engage in this scheme to live a lavish lifestyle or because of any malicious intent. She was struggling, her judgment was clouded, and her view was myopic and focused on her struggling daughter and wanting to make her happy. The circumstances of this case are situational, and are not endemic to Ms. Dubay's lifestyle or personality, particularly when the Court considers the way in which her supporters describe her.

In addition, although incarceration is certainly a more severe penalty than a non-custodial sentence, Ms. Dubay would be subject to several conditions that would have the effect of restricting her liberty. As the Supreme Court has recognized, even probation constitute punishment:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U. S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin*, 483 U. S. 868, 874 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG §5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48-49 (2007). Under these circumstances, a non-custodial sentence is appropriate and just. A period of incarceration is unnecessary to protect the public from Ms. Dubay, who has demonstrated that despite being aware of these allegations since April 2017, she has never evaded responsibility. She wrote to Cathy and Steven Brennan and accepted responsibility as soon as she received notice of the civil suit. When she received a target letter, she took appropriate action. She has complied with everything probation has asked her to do. This is not a person who requires incarceration to ensure she does not reoffend. By the accounts of those who love her most, she has more than learned her lesson.

### iii. *A Guidelines Sentence Would Lead to an Unwarranted Sentence Disparity*

Congress requires sentencing courts to "consider the need for the sentence imposed to provide . . . just punishment" while simultaneously considering the "need to avoid unwarranted sentence disparities among defendants with similar backgrounds who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2) and (a)(6). Thus, a just punishment includes the concept

15

that a just sentence is one that avoids the creation of unwarranted sentencing disparity. It is well-established that a guidelines sentence may create an unwarranted sentencing disparity, and here, imposition of a sentence within the guideline range would realize this very result. *United States v. De La Cruz*, 397 Fed. Appx. 676, 678-79 (2d Cir. 2010) (citing *Kimbrough*, 552 U.S. at 91). As the Sentencing Commission's statistical analyses from 2017 show, in the Second Circuit only approximately 27.5% of white collar (namely fraud) cases resulted in within-Guidelines sentences, and less than 1% resulted in an above-Guidelines sentence. United States Sentencing Commission Statistical Information Packet Fiscal Year 2017, Second Circuit at 20.[4] The remaining approximately 72.5% of cases resulted in a below-Guidelines sentence. *Id*.

> iv. *The Court May Consider the Collateral Consequences of a Felony Conviction as Punishment*

Prior to this case, Ms. Dubay had never been arrested. Yet, now she must live the remainder of her life as a convicted felon. The collateral consequences of her conduct will have a lasting deterrent effect, and should be a factor for the Court's consideration in imposing a sentence. *See United States v. Stewart*, 590 F.3d 93, 141-42 (2d Cir. 2009) (affirming district court's imposition of a below guidelines sentence upon finding that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant."); *United States v. Nesbith*, 188 F.Supp.3d 179 (E.D.N.Y. 2016) (imposing a probation sentence despite the guideline range of 33 to 41 months after considering, among other things, the

---

[4] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/2c17.pdf

myriad collateral consequences that befall an individual with a felony conviction). As the Second Circuit held in *Stewart*, "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence'." *Stewart*, 590 F.3d at 141.

## **CONCLUSION**

A fundamental principle of sentencing is that a court "shall impose a sentence sufficient, but not greater than necessary" to meet the goals of sentencing. 18 U.S.C. § 3553(a). Ms. Dubay's background, history and characteristics, when viewed relative to the nature of the offense, support a non-custodial sentence that includes a period of home confinement. Such a sentence is just, provides sufficient deterrence, and accounts for the criminal conduct that has brought Ms. Dubay before this Court.

                                        Respectfully submitted,

                                        THE DEFENDANT,
                                        Miriam Dubay

                                        OFFICE OF THE FEDERAL DEFENDER

Dated: October 9, 2018               */s/ Allison M. Near*
                                        Allison M. Near
                                        Assistant Federal Defender
                                        265 Church Street, Suite 702
                                        New Haven, CT 06510
                                        Phone: (203) 498-4200
                                        Bar No.: ct27241
                                        Email: allison_near@fd.org

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on October 9, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                         /s/ Allison M. Near
                                         Allison M. Near