UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim No. 3:18cr141 (SRU) |
| | : | |
| | : | October 12, 2018 |
| v. | : | |
| | : | |
| | : | |
| MIRIAM DUBAY | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

In 2008, the recession hit the victim in this case, a local franchisee of a custom closet and storage company ("Victim"), particularly hard. This family-owned company located in Shelton, Connecticut experienced a 66% drop in revenue in 15 months and its principals, C.B. and S.B., made hard decisions about which employees they had to let go during four rounds of layoffs. The defendant, Miriam Dubay ("Dubay"), was the company's sole bookkeeper and someone who C.B. and S.B. considered a trusted employee and loyal friend. Although they did not need a full-time bookkeeper because of the recession-related contraction in their business, C.B. and S.B. kept Dubay on the payroll at full salary throughout these lean times because they knew she needed the money. Dubay repaid their loyalty by engaging in a pervasive fraud, stealing over $326,000 from this small business over the course of six and a half years. Through hard work and sacrifices by the company's principals and other employees, the company is now thriving, but Dubay's betrayal left lasting wounds well beyond the obvious financial harm.

Although Dubay insists she would do anything to "undo" the pain and financial distress she caused, that apparently does not include repaying what she stole. For the 18 months Dubay has known about this criminal investigation, she has paid $425 – on a single day just two weeks before the first Pre-Sentence Report was due. Dubay claims to have undergone "extraordinary

1

rehabilitation" deserving of leniency, but one must question that claim when she has failed to pay meaningful or even regular restitution despite a positive cash flow each month.

The United States respectfully submits this Memorandum in Aid of Sentencing to aid the Court in anticipation of the sentencing hearing scheduled for October 17, 2018. For the reasons set forth below, the government asks that the Court adopt the findings of fact and the Sentencing Guideline calculations in the Pre-Sentence Report ("PSR"), and impose a sentence that adequately reflects both the nature of the offense and the individual characteristics of the offender.

## I.    PROCEDURAL BACKGROUND

On June 26, 2017, Dubay appeared in the United States District Court at Bridgeport, Connecticut, before the Honorable Stefan R. Underhill, United States District Judge, and pleaded guilty to a one-count information charging her with wire fraud in violation of 18 U.S.C. Section 1343. Sentencing is scheduled for October 17, 2018.

The parties concur with Probation's determination that that the defendant's base offense level under U.S.S.G. § 2B1.1 is 7, with 12 levels added under § 2B1.1(b)(1)(G) for a loss of more than $250,000 but less than $550,000. The defendant originally reserved the right to argue that she should not receive a two-level enhancement for abuse of position of trust under § 3B1.3, but has now conceded that argument. Three levels are subtracted under § 3E1.1 for acceptance of responsibility, resulting in a total offense level of 18. The parties concur with Probation's determination that the defendant is in Criminal History Category I. A total offense level of 18, assuming a Criminal History Category I, would result in an advisory guidelines range of 27 to 33 months' imprisonment, a fine range of $10,000 to $100,000, and a supervised release term of one to three years. The defendant agrees to make restitution in the total amount of $326,130.68.

II.   **FACTUAL BACKGROUND**

From March 2004 to December 2016, Dubay worked as the one and only bookkeeper for the Victim, a small, family-owned business in Shelton, Connecticut. Dubay earned $50,000 per year. PSR ¶ 7, 60. As the only bookkeeper for the Victim, Dubay enjoyed considerable discretion with little oversight, was entrusted with access to the company's bank accounts, check stock, accounting books and records, and petty cash, and was responsible for depositing business checks and cash payments from customers into the Victim's bank account. PSR ¶ 7.

In approximately 2010, the father of C.B., one of the Victim's principals, was very ill and C.B. was frequently out of the office caring for him, taking him to doctor's appointments, and visiting him in the hospital. PSR ¶ 12. Dubay started stealing in that timeframe. From at least as early as April 2010 until October 2016, Dubay engaged in a scheme to steal money from the Victim by writing checks on company check stock made out to "cash" and either forging the signature on the checks by hand or using a fraudulently obtained signature stamp. *See* Government Exhibit ("GX") 1, Summary of Dubay Fraudulent Checks. Dubay would either deposit the checks into her bank account at Bank of America or cash the checks at TD Bank where the Victim maintained its business account. *Id.* Dubay forged 168 separate checks for a total of $239,851.68. *Id.* Dubay concealed this fraud by selecting common vendor names and dollar amounts that would not raise attention. PSR ¶ 12.

During this same period of time, Dubay also stole cash payments made by customers which were entrusted to Dubay to deposit into the Victim's bank account. See GX 2, Dubay Stolen Customer Cash Payments. Starting at least as early as May 2010, and continuing through at least May 2016, Dubay stole customer cash payments on 103 separate occasions for a total of $86,279, and falsely reported that the deposits were received in the company software system.

3

When C.B.'s father passed away in 2012, the health of C.B.'s mother, who suffered from Alzheimer's, deteriorated, so C.B. was again out of the office frequently to care for her. When C.B.'s mother passed away in 2016 and C.B. returned to the office full-time, Dubay's stealing stopped and she left the company shortly thereafter. PSR ¶ 11, 12, 60.

Dubay started stealing in 2010 and took multiple payments well over $1,000 even during that first year. Her theft continued with disturbing frequency and amount – even in years when the company was struggling and C.B. was caring for gravely ill parents. Dubay's individual thefts are summarized in the table below, which sets forth by year, the total amount of money Dubay stole in the form of unauthorized checks, the total amount of customer cash payments she stole, and the number of instances involved.

| Year | Total Amount in Checks Misappropriated (# of instances) | Total Cash Stolen (# of instances) | Total Funds Stolen (# of instances) |
|------|------------------------------------------|--------------------------|-----------------------------|
| 2010 | $3,027.81 (7) | $14,202.00 (18) | $17,229.81 (26) |
| 2011 | $9,890.02 (21) | $5,552.00 (8) | $15,442.02 (29) |
| 2012 | $16,810.92 (25) | $6,700.00 (12) | $23,510.92 (22) |
| 2013 | $41,730.69 (36) | $18,042.00 (26) | $59,772.69 (56) |
| 2014 | $47,278.42 (31) | $16,509.00 (15) | $63,787.42 (46) |
| 2015 | $75,071.65 (33) | $16,528.00 (16) | $91,599.65 (49) |
| 2016 | $46,042.17 (15) | $8,746.00 (8) | $54,788.17 (23) |
| **TOTAL:** | $239,851.68 (168) | $86,279.00 (103) | 326,130.68 (271) |

The total loss to the Victim is $326,130.68 taken over the course of six and a half years in 271 separate instances of fraud.

On March 23, 2017, he Victim sued Dubay in a civil lawsuit and obtained an order allowing prejudgment attachment of Dubay's Connecticut home. GX 3.

On April 4, 2017, Dubay wrote to the Victim admitting her wrongdoing and offering her TIAA-CREF annuity account with a balance of $32,502.48. PSR ¶ 15.

4

Dubay entered her guilty plea on June 26, 2018, and three weeks after entering her guilty plea, on July 18, 2018, Dubay paid $425 in restitution to the Clerk's Office. At that time, a first draft of the presentence report due on August 6, 2018 with the sentencing scheduled for September 17, 2018. (Doc. 9).

III.     <u>**GUIDELINES ISSUES**</u>

    A.     **Loss and Restitution.**

Total loss is $326,130.68 as set forth above. On July 18, 2018, Dubay made a $425 restitution payment. Total restitution is therefore $325,705.68.

    B.     **Abuse of Trust.**

The parties concur with Probation's determination that Dubay should receive a two-level enhancement for having "abused a position of public or private trust or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. This typically involves a two prong analysis: (1) whether the defendant occupied a position of trust, *see United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001); *United States v. Thorn*, 446 F.3d 378, 388 (2d Cir. 2006), focusing on whether the victim entrusted the defendant with "a position that provided the freedom to commit a difficult-to-detect wrong," *id.*; and (2) whether the defendant used the position of trust in a way that significantly contributed to the crime. *Thorn*, 446 F.3d at 388.

Dubay's position as the Victim's sole bookkeeper involved considerable professional discretion that she used to engage in her fraudulent scheme. Her position allowed her to cut checks to cash and then account for them under common vendor names and intercept cash payments by customers with no oversight. Dubay's abuse of her position merits a two-point enhancement.

5

IV.     **DEFENDANT'S ARGUMENTS FOR DEPARTURE, NON-GUIDELINES SENTENCE**

      A.     **The Fraud Loss Guidelines Should Not Be Disregarded**

Dubay claims that the Sentencing Guidelines' loss table should be set aside because it increased Dubay's total offense level from a "rather low base offense level" and because the loss table lacks a "solid empirical foundation." Def. Sent. Memo. at 12. For support, Dubay cites articles finding a lack of evidence showing that prison has a greater deterrent effect on white-collar crime than does probation. This argument fails for a number of reasons.

      1.     **The Loss Enhancements Are the Product of Years of Study, Public Comment, Field Testing, and Extensive Input From All Sectors of the Federal Criminal Justice System**

Defendant's argument that the Sentencing Guidelines' loss table lacks some sort of institutional experience is mistaken. Although the loss table may not be based on a specific empirical study related exclusively to deterrence, the tables are soundly grounded in empirical data and years of national experience with the goals of fair sentencing and retribution.

The 2001 amendment to the former fraud guidelines, known as the "economic crime package," was a major overhaul for which the Sentencing Commission sought and received extensive public comment and considered data obtained during actual field testing by judges and probation officers over a six-year period. *See* Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History*, 35 Ind. L. Rev. 5, 7-8 (2001). The Commission held multiple public hearings (in 1997, 1998, and again in 2001), during which it sought and received input from the defense bar, the Justice Department, probation officers, the Criminal Law Committee of the U.S. Judicial Conference, and academic commentators. *Id.* at 33. In the summer of 1998, 22 federal judges and 21 probation officers

6

"field-tested" the loss redefinition and gave it "overwhelmingly positive" feedback. *Id.* at 36. During 1998-99, the Commission staff, in consultation with interested outside groups, continued to refine the draft loss definition, sought extensive written public comment to published drafts, and in January 2001, it published for comment a new set of proposals, including revisions to the loss table and two proposals for redefining "loss" -- a staff draft and a separate proposal submitted by the Committee on Criminal Law of the United States Judicial Conference, a committee composed of federal judges.[1] *Id.* In March 2001, after another public hearing, the Commission adopted the final economic crime package which included a "loss" definition that largely tracked the Judicial Conference Committee proposal. *Id.*

In 2003, the Commission amended the fraud guidelines again, and again considered empirical data, including an analysis of available sentencing data, and held a public meeting and solicited comments from members of the federal criminal justice system, including prosecutors, defense attorneys, federal judges, probation officers, academics, and other experts in the field. *See* U.S.S.C. Report to the Congress: Increased Penalties Under the Sarbanes-Oxley Act of 2002, January 2003 at 1, App. C at 1-2 (adding higher penalties for most egregious white collar crimes involving betrayal of public trust, endangering financial solvency of cornerstone corporations, or monetary loss in the hundreds of millions).

Most recently, the Commission in 2015 again updated and overhauled parts of §2B1.1 in a way that reaffirmed the empirical nature of this Guideline section. The Commission adjusted the loss tables downward to adjust for the "gradual decrease in the value of the dollar over

---

[1] The Judicial Conference is comprised of the Chief Justice of the United States and the chief judge of each judicial circuit, the Chief Judge of the Court of International Trade, and a district judge from each regional judicial circuit. The Chief Justice makes committee appointments, including to the Committee on Criminal Law.

7

time," *see* U.S.S.G. Supplement to App. C, 791 at 109, and adjusted enhancements for number of victims, intended loss, sophisticated means, and loss related to fraud on the market. *See* U.S.S.G. Supplement to App. C, 792 at 110-114. While these adjustments do not directly bear on the present case, they reaffirm the Commission's long effort to make the fraud Guidelines as empirically sound as possible. *See* U.S.S.G. Supplement to App. C, 792 at 112 ("This amendment is a result of the Commission's multi-year study of §2B1.1 and related guidelines, and follows extensive data collection and analysis relating to economic offenses and offenders.")

To dismiss the fraud guidelines (and loss tables) altogether with nothing more than a sweeping claim that they lack "empirical study," is overly simplistic. The current guidelines are the product of years of study, public comment, field testing, and extensive input from all sectors of the federal criminal justice system, including from the defense bar and the very federal judges who have spent years implementing them.

**2.      The Loss Enhancements Address More Than Just Deterrence Are Routinely Applied In Cases of Personal Gain at the Expense of A Victim**

Dubay is wrong to focus only on the deterrent effects of the loss enhancement. Her argument entirely ignores the retributive purposes of sentencing which is listed as the very first factor in § 3553(a)(2), requiring a sentencing judge to impose sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The loss table proposes increasing punishment for increasing loss amounts because of the commonsense notion that the greater the loss, the more culpable the crime. When that loss directly harms a victim and results in personal gain to the defendant, that commonsense notion makes good sense.

8

Dubay cites several cases criticizing the loss enhancements as out of proportion to the harm, but those cases are not instructive here. In *United States v. Algahaim*, the defendant was convicted of misuing public assistance benefits and his offense level was increased from a base offense level of 6 to 16 for amount of loss. 842 F.3d 796, 800 (2d Cir. 2016). The Second Circuit made no finding of error at all but instead remanded so that the district court could consider whether a non-guidelines sentence would be appropriate, recognizing that the Commission approached fraud loss by using a low base offense level and larger and larger enhancements for larger and larger losses. *Id.*

In *United States v. Adelson*, a securities fraud case, the district court concluded that the loss enhancement would work an injustice by imposing a life sentence on a company president who covered up the end of what he "belatedly learned" was a substantial fraud perpetrated by others, serving almost as an "accessory after the fact" to accountants who designed the scheme. 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006). In *United States v. Gupta*, another securities fraud case, the district court concluded that the huge increase in recommended Guidelines sentences for securities fraud cases rendered many sentences "irrational on their face" because they effectively ignored the 3553(a) factors). 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). In *United States v. Parris*, another securities fraud case, the district court concluded that recommended Guidelines range of 360 to life in a pump and dump scheme was "absurd on its face" (citation omitted) and imposed a 60 month sentence. 573 F. Supp. 2d 744, 746, 754 (E.D.N.Y. 2008).

Dubay's case does not present any comparable arguments for leniency or any reason to disregard the loss enhancement. The victim here was a small business kept afloat by the hard work and sacrifices of its principals, C.B. and S.B., who were profoundly impacted by Dubay's betrayal. The victim impact statements of C.B. and S.B. describe the financial challenges, personal pain and humiliation, and ongoing doubt that Dubay's crime caused. Loss here cannot

be overstated where Dubay accumulated the entire loss personally, check by check, and payment by payment, by engaging in hundreds of acts of fraud. She alone decided in each instance how much to steal and when to do it. The loss amount here was not driven up by someone or something out of the defendant's control such as the operation of the stock market. The defendant did not join a scheme conceived by others mid-stream or take a backseat to others who were in control. Instead, the defendant devised and executed the scheme by herself, from beginning to end. Dubay personally profited from the fraud by putting $326,130.68 into her pocket that she obtained by false pretenses directly from the Victim. She did so, not for any altruistic purpose, or because she had an acute financial need, but rather, to enrich herself personally, despite the steady salary the Victim was already paying her. The fact that defendant personally profited from the Victim's loss dollar-for-dollar renders a departure or below guidelines sentence based on the notion that loss is overstated entirely inappropriate.

      **B.**     **Extraordinary Rehabilitation.**

      Dubay argues that she deserves a downward departure or non-Guidelines sentence based on extraordinary rehabilitative efforts. Dubay cites that: (1) she has been in mental health treatment with a clinical social worker for approximately six months, (2) she is taking anti-depression medication, (3) she has stopped drinking for almost 90 days, and (4) she maintains employment by working at a grocery store deli counter. Def. Sent. Memo. at 10.

      **1.**     **Legal Authority**

      A sentencing judge may exercise discretion and depart from the applicable guideline range in light of a defendant's efforts towards rehabilitation, but initial efforts, rather than sustained evidence of rehabilitation, is not a basis for downward departure. *United States v. Maier*, 975 F.2d 944, 948-49 (2d Cir. 1992). Indeed, the Second Circuit has cautioned that such a

departure is not warranted simply because a defendant "has entered a rehabilitation program," cautioning that "[s]uch programs, easily entered but difficult to sustain, cannot be permitted to become an automatic ground for obtaining a downward departure." *Id.* at 948. *See also United States v. Williams,* 65 F.3d 301, 305 (2d Cir. 1995) (stressing that "a tentative step towards rehabilitation usually is not enough to warrant a downward departure."). Instead, the Second Circuit has directed district courts to consider "the nature of the defendant's addiction, the characteristics of the program she has entered, the progress she is making, the objective indications of her determination to rehabilitate herself, and her therapist's assessment of her progress toward rehabilitation and the hazards of interrupting that progress." *Id.* at 948-49. Moreover, "there must be evidence of extraordinary rehabilitation before the sentencing court can downwardly depart on this basis." *United States v. Bryson*, 163 F.3d 742, 747 (2d Cir. 1998).

The cases Dubay cites only highlight that her case falls fall short of the "extraordinary." *See Maier*, 975 F.2d at 948-49 (affirming departure based on drug rehabilitation based on detailed findings of "all of the pertinent circumstances, including the nature of the defendant's addiction, the characteristics of the program she has entered, the progress she is making, the objective indications of her determination to rehabilitate herself, and her therapist's assessment of her progress toward rehabilitation and the hazards of interrupting that progress."); *United States v. Core,* 125 F.3d 74, 77 (2d Cir. 1996) (remanding for consideration of post-conviction rehabilitation); *United States v. Workman*, 80 F.3d 688, 701 (2d Cir. 1996) (affirming departure based on extraordinary rehabilitation where defendant, a former leader of a major narcotics trafficking enterprise who had participated in an attempted murder of a potential witness and in the murder of another individual, left the gang, joined U.S. Army and completed his military service honorably, and was found to have undertaken these efforts not because of the impending

11

prosecution but rather, as "an independent (and quite impressive) effort.").

    **2.**    **Dubay's Efforts, While Commendable, Are Not "Extraordinary," Especially Given Her Failure to Pay Regular Restitution**

Dubay's rehabilitation efforts simply do not appear to qualify as "extraordinary" either alone or in combination. Extraordinary rehabilitation is demonstrated by the degree to which rehabilitation has transformed Dubay from her own personal "starting point" established at the time the offense conduct was committed to the time of sentence. *United States v. Middleton*, 325 F.3d 386, 389 (2d Cir. 2003). That Dubay now maintains steady employment and has stopped drinking (conditions which would be required on supervision in any event), while commendable, does not seem extraordinary when compared to her starting point. *See, e.g., United States v. Sherry*, 107 Fed. Appx. 253, 259 (2d Cir. 200) (summary order) (affirming district court's denial of "extraordinary rehabilitation" because efforts were benefitted defendant as well as society and were therefore merely "admirable;" and because efforts were undertaken from a starting place of "reasonable middle-class circumstances," a "good education," "supportive family," and "several good jobs.") (citation omitted), *judgment vacated by* 544 U.S. 917 (2005) (remanding for further consideration in light of *Booker*).

    Further, Dubay's rehabilitative efforts -- 90 days of sobriety and six months of mental health therapy that she attends once every week or two – while perhaps good initial efforts, are not the sort of sustained conduct to support a finding of "extraordinary rehabilitation." *Maier*, 975 F.2d at 948-49. Whether to justify a departure or a non-Guidelines sentence, this Court simply has insufficient information to make any conclusion as to the nature of the defendant's treatment, the progress she is making, the objective indications of her determination to rehabilitate herself, her therapist's assessment of her progress toward rehabilitation, the potential

hazards of interrupting that progress, or the unavailability of suitable therapy within the Bureau of Prisons.

Most notably lacking in Dubay's rehabilitation efforts however is any commitment to paying restitution. Since April 3, 2017, when Dubay wrote to C.B. and S.B. and offered her annuity account with a balance of $32,502.48 (PSR ¶ 15), Dubay has paid a total of $425 in restitution on July 18, 2018. She has not paid over the $213.40 per month she receives from the annuity to the victim. Even accounting for her now-modest salary, Dubay enjoys a positive net cash flow of $959.16 per month, but she has made no regular payments to the Victim whatsoever. Her cash flow statement indicates that she could cover her single restitution payment of $425 twice over in a single month with a bit leftover. One would expect a genuinely rehabilitated person to consider victim restitution to be of primary importance. Instead, the timing of Dubay's payment, made on a single day approximately two weeks before the first draft of the PSR was due and 18 months after she initially offered $32,502.48 to the Victim, suggests that the payment was motivated by her concern about the sentencing rather than the Victim's loss.

Dubay has apparently made much of her July 2018 payment of $425 in restitution to her family and friends. Her well-intentioned supporters insist that Dubay should be sentenced to a non-custodial sentence "since she is already making financial restitution" (Doc. 20-8); that she was "already working with someone to make reparations to [the Victim]" (Doc. 20-6 at 1); that she has "offered what restitution she can" (Doc. 20-2 at 2); that she "had every intention to pay back all of the money she took" (Doc. 20-5 at 1); and that she "will continue to work towards reparations if she is allowed." (Doc. 20-7 at 2). These friends and family members only know what they are told and Dubay has clearly given them the impression that she is fully committed

to making restitution and has already paid a significant amount. That impression is squarely at odds with Dubay's actual conduct which shows no commitment to paying restitution.

This lack of concern for restitution is underscored by Dubay's statement to the Court (Doc. 20-1) in which she stresses all that she has done in terms of rehabilitating herself, including seeing a therapist, taking Prozac, and quitting alcohol. She describes in detail undeniably sad facts about a marriage that ended 32 years ago, but nowhere mentions or even refers to her obligation to pay restitution. She fails to describe the existence of that obligation, any plan to pay restitution, or explain why she hasn't used her positive net cash flow or annuity payments to repay the victim.

In her letter to the Court, Dubay states that "[i]f there was any way to undo what I did I would in a heartbeat" and she insists in her sentencing memorandum that she has "devoted significant time to addressing the cause of her criminal conduct" and concludes that her depression and alcohol use "were the components that led her to engage in criminal behavior." (Def. Sent. Memo. at 10). To be sure, that history is to be considered at sentencing, but ascribing it as the "cause of her criminal conduct" goes way too far. If Dubay's rehabilitation were really as transformative and heartfelt as all of that, she would have made some sustained effort to pay restitution and formulated a plan for paying in the future. Her failure to do so speaks volumes.

> Talk is cheap, and so [cases] emphasize that acceptance of responsibility is to be inferred from deeds, not from weepy mea culpas at sentencing. (Judges fool themselves if they think they can infer sincerity from rhetoric and demeanor.) A guilty plea is a deed. And so is voluntary restitution. Where it is feasible, its refusal, demonstrating as it does a desire to retain the fruits of the crime, blocks any inference of remorse or repentance. The remorseful or repentant criminal would want to do everything possible to rectify the harmful consequences of his crime, and so if

14

he still has any of the loot he will return it.

*United States v. Wells*, 154 F.3d 412, 413-14 (7th Cir.1998).

**V.      SECTION 3553(a) SENTENCING FACTORS**

> **A.      Seriousness of the Offense, the Need to Promote Respect for the Law and the Need to Provide Just Punishment**

The magnitude of Dubay's fraud on the Victim is significant by any measure, and punishment should be proportionate to the offense. Dubay engaged in 271 separate instances of fraud in a scheme that lasted for six and a half years. She abused the discretion she was given as bookkeeper in order to commit and cover up her deception. She was the sole architect of this fraudulent scheme and she alone determined when to take money, how often, and in what amounts.

Dubay's fraud is all the more distressing because she cheated an employer who had faith in her professionally and personally, and kept her employed when the company had no need for a full-time bookkeeper. Even when the company's revenue dropped 66% in 15 months (Victim Impact Statement of S.B.) and the company went through four rounds of layoffs, Dubay was kept on. Dubay's fraud had a serious negative impact on the company, its principals, and other employees – a fact that she well knew. C.B. and S.B. did not take salaries for over two years during the aftermath of the 2008 recession and could not give their employees raises for many years because there was never enough money at the end of the year. PSR ¶ 12. The first year after Dubay left and the company did not have to absorb her stealing, it was able to give pay raises to its employees. *Id.* C.B. and S.B. spent many hours going through bank records and company ledgers to figure out what Dubay had stolen – a process that has itself been a source of extraordinary stress. *Id.*

For her part, Dubay had a front row seat to the company's struggles. She knew exactly how tight money was and how there were years when the company could not give employees the raises the company's principals believed they deserved. This went on while Dubay talked openly about remodeling her master bedroom and bathroom, renovating her home office, buying new furniture for her home and an apartment, getting a new laptop, buying a $650 coat, and installing hardwood floors. *Id.*

The personal pain and "humiliation" that Dubay caused is evident in the two Victim Impact Statements the Victim's principals submitted. They believed Dubay was a capable employee and friend who had should be kept on during financially challenging times even when the company had no need for a full-time bookkeeper. Dubay's well-planned and prolonged abuse of the Victim merits a term of imprisonment.

### B.    History and Characteristics of the Defendant

Dubay was raised by her mother and father in a large, close-knit, intact family with five siblings. PSR ¶ 34. She describes having had an "excellent" relationship with her mother and being her father's "princess." PSR ¶¶ 39, 40. She grew up in the family home New Canaan in a "nice" neighborhood living a "footloose and fancy free" life. PSR ¶ 35. Dubay attended a prestigious private high school, School of the Holy Child, in Rye, New York and graduated from Michigan State University with a degree in Sociology. PSR ¶¶ 55-56. She also graduated from Lansing Community College with an associate's degree in Accounting. PSR ¶ 57. Dubay has had long periods of steady employment as a bookkeeper. PSR ¶¶ 60-63.

Dubay has high blood pressure and at the time of the presentence interview was drinking 5-6 glasses of wine per day. PSR ¶¶ 48-49. She reports having quit drinking "cold turkey" and has been sober for nearly 90 days. Dubay's two prior marriages ended in divorce, with her first

husband having been emotionally and physically abusive. PSR ¶¶ 44-45. She separated from her first husband in 1986, and separated from her second in 2016. *Id.* Dubay has two grown daughters (one from each marriage) and she does not speak to either of them.

There is no indication that Dubay was suffering any acute financial need that motivated the offense conduct. Although she drank heavily during at least some portion of the offense conduct, there is no indication she was impaired at work.

### C.   The Need for Deterrence and to Protect the Public

General deterrence is an important purpose to be served by the sentence in this case. Dubay's sentence should serve as a clear message to those who handle finances in positions of trust who may be tempted to embezzle from their employers when they find their personal finances are not to their satisfaction.

Specific deterrence is also important here, given the way Dubay executed her crimes. Her repeated instances of fraud committed against an employer who trusted her and her ability to conceal her fraud over such a prolonged period, shows a steadfast commitment to criminality and indifference to the truth. Dubay did all of this while she had no apparent need for the money and when her employer was suffering tremendous personal stress in caring for gravely ill parents. That Dubay points to her ex-husbands, her daughter, her drinking, and her depression as the cause of her crimes ignores a more obvious explanation – Dubay wanted the money to spend on things she could not otherwise afford. This striking lack of clarity coupled with a failure to acknowledge her restitution obligation suggest that specific deterrence remains a concern.

## VI.   CONCLUSION

Based on the foregoing, the government respectfully requests a sentence within the advisory Guidelines range.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


/s/   *Susan L. Wines*
SUSAN L. WINES
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv2379
157 Church Street
New Haven, Connecticut 06510
Tel. (203) 821-3700
susan.wines@usdoj.gov

18

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ *Susan L. Wines*

_____

SUSAN L. WINES
ASSISTANT UNITED STATES ATTORNEY

19